UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------- x

| | |
|---|---|
| SUN, A SERIES OF E SQUARED INVESTMENT : <br> FUND, LLC, E-SQUARED CAPITAL FUND, L.P., : <br> S.H.N FINANCIAL INVESTMENTS LTD., : <br> FLAMINGO DRIVE M&M, LLC and STABLE : <br> ROAD CAPITAL, LLC : <br> : <br> *Plaintiffs*, : <br> : <br> v. : <br> : <br> SUNDIAL GROWERS INC., EDWARD : <br> HELLARD, and TORSTEN KUENZLEN : <br> *Defendants*. : | 1:20-cv-03579 <br><br> **FIRST AMENDED** <br> **<u>COMPLAINT</u>** <br><br><br> Jury Trial <br> Demanded |

------------------------------------------------------------------- x

Plaintiffs SUN, A Series of E-Squared Investment Fund, LLC, E-Squared Capital Fund, L.P., S.H.N Financial Investments Ltd., Flamingo Drive M&M, LLC and Stable Road Capital, LLC ("Plaintiffs"), by and through their attorneys, Feuerstein Kulick LLP, hereby file their first amended complaint against Defendants Sundial Growers Inc. ("Sundial" or the "Company"), Edward Hellard, and Torsten Kuenzlen (the "Officers" or the "Individual Defendants") and allege the following, based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and upon information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiffs' attorneys that included, a review of U.S. Securities and Exchange Commission ("SEC") filings, wire and press releases published by Defendants, analysts' reports and advisories about the Defendants, and information readily obtainable on the Internet.

**NATURE OF THE ACTION**

1.      This is an action for money damages and other relief arising out Defendants'
egregious and fraudulent misconduct in connection with the Company's final capital raise prior to
its initial public offering (the "Pre-IPO Round").

2.      As set forth more fully below, Sundial and Kuenzlen represented to investors,
including Plaintiffs, that the Company was on the precipice of closing on a transaction with Bridge
Farm, a UK-based agricultural company, that possessed a "hemp license" that would enable the
Company to "almost immediately" export hemp and CBD to the European Union.

3.      Defendants repeatedly represented that Bridge Farm's hemp license was fully
operational, and further boasted that the Company's investment in Bridge Farm would enable the
Company to be "first to market" in Europe such that it could create a stronghold in Europe's
nascent cannabis market.  In fact, Defendants initially claimed that the acquisition of Bridge Farm
would enable Sundial to generate more than C$255 million in revenue and C$115 million in
EBITDA in 2020.

4.      Defendants, therefore, represented that Bridge Farm's then-existing hemp license
was both immensely valuable, and something that the Company could capitalize on immediately
following the acquisition.  At no point did Defendants state (or even intimate) that Bridge Farm
would require ***additional licenses*** in order to achieve the Company's stated, strategic entry into
the European Union's CBD market.  To the contrary, Defendants purposefully led Plaintiffs to
believe that Bridge Farm's hemp license was raring to go.

5.      Based on these representations – and others – Plaintiffs invested more than $7
million in the Company's Pre-IPO Round.  And in exchange for their investment, Plaintiffs
received 8% senior, unsecured convertible notes (the "Convertible Notes") that permitted Plaintiffs

to convert into the common stock of the Company at a 20 - 30% discount to the IPO price (depending on when the IPO actually occurred).

6.      As it turns out, Defendants' representations concerning Bridge Farm, and the value and status of its then-existing hemp license, were grossly exaggerated and materially misleading. In fact, Bridge Farm did not possess the necessary licenses in order to commercially cultivate and export hemp, or CBD, to the EU.  Instead, it was later revealed that Bridge Farm would require *additional licenses* in order to achieve what Defendants had told Plaintiffs they could achieve – and would achieve – immediately following the Company's acquisition of Bridge Farm.

7.      Without the necessary licenses, Bridge Farm could not, as Defendants had represented, (i) produce the quantity of hemp required to generate C$255 million in revenue in 2020, and/or (ii) legally export hemp (or CBD) to other nations in the EU. In fact, the Company has effectively conceded as much by recently announcing that it intends to (i) take a one-time charge of $100 million to the "goodwill" associated with the Bridge Farm acquisition, and (ii) sell Bridge Farm.

8.      As set forth more fully below, Defendants' egregious misconduct gives rise to claims arising under: (i) Sections 12(a)(2) and 15 of the Securities Act of 1933 (the "Securities Act"), (ii) Section 10(b) and 10(b)5 of the Securities Exchange Act of 1934 ("Exchange Act"), and (iii) New York State and Canadian law (including breach of contract, fraud in the inducement, unjust enrichment and negligent misrepresentation).

9.      Plaintiffs, therefore, seek a judgment consisting of (i) monetary damages in an amount to be determined at trial but no less than $7 million, (ii) pre-judgment interest, (iii) their attorneys' fees incurred in bringing this action, and (iv) whatever further relief the Court deems just and proper.

## VENUE AND JURISDICTION

10.     This action arises under Sections 10(b) and 10(b)5 of the Exchange Act, Section 15 of the Securities Act,  15 U.S.C §78j(b), §78r, §78(t)a, 17 C.F.R. §240.10b-5, and New York and Canadian law.

11.     This Court has subject matter jurisdiction over the action pursuant to Section 27 of the Exchange Act, 28 U.S.C. §§ 1331 and 1337.  The Court also has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

12.     Venue is proper in this district pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391. The transactions, acts, practices and courses of business alleged herein took place within the Southern District of New York, including because Defendants solicited Plaintiffs' investment within this District.  In addition, Defendants used electronic communications and other interstate facilities to communicate with and disseminate false and misleading statements to Sundial's shareholders in the Southern District of New York. The shares of Sundial are publicly traded in this District on NASDAQ.  In addition, upon information and belief, the Individual Defendants made numerous visits to New York City for the specific purpose of soliciting investors for the Company, and raising money in connection with the Company's Pre-IPO Round, which Plaintiffs ultimately invested in.  Moreover, Hellard was present in New York, and rang the bell at the Company's Initial Public Offering.

## THE PARTIES

13.     Plaintiff E-Squared Capital Fund, L.P. ("E-Squared"), is an investment fund with a principal place of business of 150 East 52nd Street, 22nd Floor, New York, New York.

14.     Plaintiff SUN, A Series of E Squared Investment Fund, LLC ("SUN"), is a single purpose entity with a principal place of business of 6510 South Millrock Drive, Salt Lake City,

Utah. Assure Fund Management II, LLC is the sole manager of SUN.

15.     Plaintiff S.H.N Financial Investments Ltd. (d/b/a "Shamir Capital") is a hedge fund with a principal place of business of 8 Abba Even Blvd, B Entrance Herzliya, 46733, P.O Box 2181, Israel.

16.     Plaintiff Flamingo Drive M&M, LLC is a limited liability company formed under the laws of the State of Delaware with its principal place of business located at 300 W. 41st Street, Suite 202, Miami Beach, Florida.

17.     Plaintiff Stable Road Capital LLC is a limited liability company formed under the laws of the State of California with its principal place of business located at 1345 Abbot Kinney Blvd., Venice, California.

18.     Upon information and belief, Defendant Sundial Growers Inc. ("Sundial"), is a licensed cannabis producer with its principal place of business at #200, 919 – 11 Avenue SW, Calgary, Alberta T2R 1P3, Canada.  Sundial is publicly traded on NASDAQ with the ticker symbol "SNDL".

19.     Upon information and belief, Defendant Edward Hellard ("Hellard") was at all relevant times the Executive Chairman of Sundial.  Upon further information and belief, Hellard was, during the relevant time, the Company's largest shareholder and is now Chair of Sundial's Mergers and Acquisitions Committee.  Upon further information and belief, Hellard is an individual who resides in Alberta, Canada.

20.     Upon information and belief Defendant Torsten Kuenzlen ("Kuenzlen") was the Chief Executive Officer of Sundial from February 2018 to February 2020.  Upon further information and belief, Kuenzlen is an individual who resides in Alberta, Canada.

## FACTS UNDERLYING PLAINTIFFS' CLAIMS

### *The Company's Business*

21.    Sundial is a licensed producer of cannabis in Canada.

22.    As set forth on Sundial's website, the Company's core tenant is that "[t]here are many reasons people choose cannabis – it's used for medicine, for personal wellness and for fun."

23.    Thus, according to the Company, it cultivates cannabis for three primary reasons: (i) to heal (*i.e.*, where people use cannabis products as prescription medicines), (ii) to help (*i.e.*, where people use cannabis products to promote overall health and wellness through cannabidiol ("CBD") (the primary, non-psychoactive cannabinoid found in the cannabis plant), and (iii) to play (*i.e.*, where people use cannabis products to enhance social, spiritual and recreational occasions).

24.    On or about February 26, 2018, the Company appointed Kuenzlen – who allegedly possessed more than 20 years of experience in the global consumer goods sector and spent time working for companies such as Molson Coors and The Coca Cola Company – as its new Chief Executive Officer.

25.    In the press release that announced his appointment as the new CEO, Kuenzlen was quoted as saying that "I am excited to be joining Sundial as Canada approaches adult-use cannabis legalization and the trend of global legalization for medical and adult-use purposes increases.  We have the once-in-a-lifetime opportunity to build Sundial into a leading Canadian and international cannabis company and to help shape this new multi-billion dollar consumer industry."

26.    In that same press release, the Company touted its own perceived qualities by noting that it possessed experience in the "fast-moving consumer goods industry," which enabled the Company to "not just grow the finest quality cannabis, but also create exceptional consumer and customer experiences."

27.    On October 17, 2018, Canada legalized adult-use cannabis throughout the Country.

**_Defendants Fraudulently Solicit Plaintiffs' Investment in the Pre-IPO Round_**

28.    Approximately one month after Canada legalized recreational cannabis, in or ,
Plaintiffs met with Kuenzlen who told Plaintiffs, in sum or substance, that the Company is
"targeting" the "better, best" part of the legal cannabis market.

29.    On or about January 15, 2019, certain Plaintiffs received a non-disclosure
agreement from Cowen, Inc. ("Cowen"), a leading investment bank in the cannabis sector, that
had been retained by the Company to serve as the placement agent for Sundial's capital raising
efforts.

30.    Individual members of Plaintiffs thereafter met with Kuenzlen and the Company's
CFO in Toronto, Canada on or about January 24, 2019 (the "January 24th Meeting").  At the
January 24th Meeting, the Company provided these individuals with a presentation outlining the
Company's current and future operations (the "January Investor Presentation").

31.    The January Investor Presentation stated that the Company was seeking to raise
U.S. $50 million to fund the acquisition of Bridge Farm (the "Bridge Farm Acquisition") ) and
provide working capital to the Company.

32.    The January Investor Presentation stated that Bridge Farm would prove beneficial
to the Company because Bridge Farm possesses, _inter alia_, "**_[a] hemp cultivation license [that]_**
**_allows for the cultivation, processing and export of finished goods from the UK_**." (Emphasis
added.)

33.    The January Investor Presentation further stated that the Bridge Farm Acquisition
would "enable the Company to produce and distribute **_at scale almost immediately_** and more
quickly than competitors".  (Emphasis added.)

34.     In other words, the January Investor Presentation represented that Bridge Farm's hemp license was fully secured, operational, and would allow the Company to enter the European Union's CBD marketplace immediately following the Bridge Farm Acquisition.

35.     Consistent with Defendants' representations concerning Bridge Farm's hemp license – *i.e.*, that the license provided the Company with the immediate ability to cultivate, process and export hemp/CBD into the EU –Defendants provided Plaintiffs with knowingly false, but tantalizing, fiscal projections for 2020.   These projections further underscored Defendants' misrepresentations concerning the immediate advantages and value of Bridge Farm's hemp license.

36.     Specifically, the January Investor Presentation stated that the Company expected Bridge Farm to generate C$255 million in revenue and C$115 million in EBITDA in 2020, which represented (i) more than four times the EBITDA that the Company expected Bridge Farm to generate in 2019, and (ii) more than fifty percent of the total EBITDA that Sundial anticipated in 2020.

37.     Shortly after the January 24th Meeting, the parties began discussing terms related to Plaintiffs' potential investment in the Company.

38.     Before the parties could agree upon terms for Plaintiffs' potential investment in the Company, the Company released a new investor presentation (the "Spring Investor Presentation").

39.     Unlike the January Investor Presentation, the Spring Investor Presentation indicated that the Company was seeking to raise C$100 million:  C$70 million to fund the Bridge Farm Acquisition, and C$30 million to pay off the loan held by BMO.

40.     The Spring Investor Presentation also (i) discussed the Bridge Farm Acquisition (along with the supposed value of its hemp license), and (ii) set forth the conversion rights that an

investor would receive as part of its contemplated investment.

41.     As set forth in the Spring Investor Presentation, an investor would receive an 8% convertible, unsecured promissory note that could, at the investor's option, convert into common shares upon a qualifying IPO at a discount of:  (i) 20.0%, if the qualifying IPO occurred on or before September 30, 2019, (ii) 25.0% if the qualifying IPO occurred on or between October 1, 2019 and March 31, 2020, (iii) 27.5% if the qualifying IPO occurred on or between April 1, 2020 and September 30, 2020, and (iv) 30.0% if the qualifying IPO occurred on or after October 1, 2020.

42.     Because the discount to the IPO price would increase with time, the current shareholders of the Company – including Hellard (who was the largest individual shareholder in the Company) and Kuenzlen – had a clear motive to complete the IPO as soon as possible to maximize their personal holdings in the Company.

43.     In addition to setting forth the terms of the Pre-IPO Round, the Spring Investor Presentation (like the January Investor Presentation) stated that the Bridge Farm Acquisition would prove beneficial to the Company because Bridge Farm possesses, *inter alia*, "[a] hemp cultivation license" in the UK.

44.     The Spring Investor Presentation further stated that the Bridge Farm Acquisition would "enable us to be the first-mover in mass-scale, global hemp-derived CBD products".

45.     By emphasizing the "first-mover" advantage that the Bridge Farm Acquisition would supposedly provide to the Company, Defendants reinforced their prior misrepresentations concerning the supposedly immediate value offered by the Bridge Farm Acquisition.

46.     Like the prior presentation, the Spring Investor Presentation illustrated the immediate impact that Bridge Farm's hemp license would bring to the Company's business.

47.     For example, the Spring Investor Presentation stated that the Company expected Bridge Farm to produce enough hemp and CBD to generate C$239.3 million in revenues and C$79.5 million in EBITDA in 2020, which represented (i) more than 12 times the EBITDA that the Company expected Bridge Farm to generate in 2019, and (ii) more than fifty percent of the 2020 expected EBITDA for Sundial.

48.     In short, Defendants – once again – depicted Bridge Farm as "ready and able" to produce commercial amounts of hemp and touted the Bridge Farm Acquisition as a material transaction that was critical to the Company's future success and growth.

49.     Upon information and belief, Defendants knew (or should have known) that Bridge Farm did not possess the necessary hemp licenses that would allow Bridge Farm to (i) produce and cultivate hemp in a commercial manner, and/or (ii) to distribute hemp or CBD "at scale almost immediately and more quickly" than competitors.

50.     Upon further information and belief, (i) Hellard led Sundial's due diligence of, and negotiations with, Bridge Farm and was aware that Bridge Farm did not currently possess the necessary licenses to cultivate, process and distribute hemp or CBD in a commercial manner such that Sundial could generate hundreds of millions of dollars in revenue in 2020, and (ii) Hellard informed the rest of the Individual Defendants of the same.

51.     In other words, Defendants knew (or should have known) that the Company would not be able to generate C$79.5 million of EBITDA in 2020 through its acquisition of Bridge Farm because Bridge Farm's then-existing license would not offer the Company the supposed advantages that Defendants had claimed.

52.     Upon information and belief, Defendants nevertheless proceeded with the Bridge Farm Acquisition – and represented to investors (including Plaintiffs) that the Bridge Farm

Acquisition was a material component of the Company's 2020 revenues and future growth (even though Defendants knew that Bridge Farm did not possess the necessary licenses to reach those financial projections) – because Defendants were solely focused on maximizing their personal holdings and (i) were eager to complete the IPO sooner rather than later to avoid additional dilution, and (ii) believed that the Bridge Farm Acquisition made the success of the Company's IPO more likely.

53.     Defendants and their agents continued to reinforce their misrepresentations concerning Bridge Farm's licensing status in the weeks and months following the January and Spring Investor Presentations.

54.     For example, on or about March 12, 2019, Cowen – in its role as the Company's placement agent – emailed certain Plaintiffs and noted that "Bridge Farm is a ***fully functional, licensed facility*** that will allow the [C]ompany to be a first mover in the mass scale, global hemp-derived CBD product market."  (Emphasis added.)  Upon information and belief, Cowen made these misrepresentations at the direction of, and with the full knowledge and consent, of the Company and the Individual Defendants.

55.     On or about March 21, 2019, Kuenzlen and the Company's CFO came to New York City and met with principals of E-Squared to further discuss the potential investment in the Company.  Both Kuenzlen and the Company's CFO discussed many of the points set forth in the Spring Investor Presentation (including the data points concerning Bridge Farm).

56.     Upon information and belief, Kuenzlen and the Company's CFO met with other potential investors in New York as well during that same time period and did so, upon information and belief, with Hellard's knowledge and understanding.

57.     On or about April 24, 2019, BMO – which served as the co-placement agent with

Cowen – sent a one-page summary of the Pre-IPO Round and noted that "Sundial is acquiring Bridge Farm, *a fully functional, licensed facility* in the UK which will allow the company to be the first-mover in the mass-scale, global hemp-derived CBD product market." (Emphasis added.) Again, Cowen's misrepresentations were made, upon information and belief, at the direction of, and with the full knowledge and consent, of the Company and the Individual Defendants.

58.     In or around that same time, Defendants provided Plaintiffs with the full suite of offering documents for the Pre-IPO Round, which included (i) the Spring Investor Presentation, (ii) the Term Sheet For Convertible Note Financing of Sundial Growers Inc. dated March 11, 2019 (the "Term Sheet"), and (iii) Sundial Grower's Inc.'s Convertible Note Purchase Agreement (the "Note Purchase Agreement") (the "Offering Documents").

### *Unaware of Defendants' Fraud, Plaintiffs Invest in the Company*

59.     Because Defendants concealed several material facts from Plaintiffs, and Plaintiffs were unaware that Bridge Farm did not possess the ability to cultivate, process and/or export hemp/CBD into the EU as Defendants had represented, Plaintiffs ultimately agreed to invest approximately $7 million in the Pre-IPO Round.

60.     In making their investment into the Company, Plaintiffs relied on Defendants' misrepresentations and omissions.

61.     For example, in an investment memo written by Sun's managing member prior to the investment, Sun's managing member wrote:

> "Recently [the Company] bought Bridge Farm in the EU … accelerating their entry into the EU at scale with operational facilities… Their hemp license permits for cultivation, processing, and export of finished product from the U.K. … The acquisition is expected to generate C$115 of EBITDA in 2020 and there will be significant product rollouts."

62.     Based on Defendants' misrepresentations – and, in particular, their representations

that Bridge Farm possessed a license that presently allowed Bridge Farm to cultivate, process and export hemp/CBD in the EU. – Sun's managing member projected that Sundial would generate $248 million in EBITDA in 2020.

63.     In addition, Defendants' false representations – both about Bridge Farm's ability to cultivate, process and export hemp/CBD and its projected revenue/EBITDA generated from those activities – made Sundial appear to be well-priced in comparison to other publicly traded Canadian cannabis companies (when, in fact, it was not).

64.     In connection with Plaintiffs' investment in the Company, the parties entered into the Note Purchase Agreement, pursuant to which the Company made numerous representations and warranties.

65.     Among other things, the Company represented and warranted that:

- "The Company has provided Purchasers with all information requested by the Purchasers in connection with their decision to purchase the Notes. Neither this Agreement, the exhibits hereto, the Indenture, the investor presentation dated "Spring 2019" (the "Investor Presentation") provided to the Purchasers in connection with the offering of Notes (the "Offering Materials"), **nor any other document delivered by the Company [e.g., the January Investment Presentation, the emails from BMO and Cowen] to Purchasers in connection herewith or therewith at the Closing or with the transactions contemplated hereby or thereby, contain (i) any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements contained herein or therein not misleading or (ii) any misrepresentation within the meaning of Canadian securities laws**."

- "Neither the Company nor any subsidiary of the Company is in violation of any applicable statute, rule, regulation, order or restriction of any domestic or foreign government or instrumentality or agency thereof. **The Company and each subsidiary of the Company have and are in compliance with all franchises permits, licenses and any similar authority . . . necessary for the conduct of its business as now being conducted by the Company and each subsidiary of the Company, the lack of which . . . could materially and adversely affect the business, assets, properties or financial condition of the Company**."

- "The representations, warranties, covenants and agreements made herein shall survive the closing of the transactions contemplated hereby. All statements as to factual matters contained in any certificate or other instrument delivered by or on behalf of the Company pursuant hereto in connection with the transactions contemplated hereby shall be deemed to be representations and warranties by the Company hereunder solely as of the date of such certificate or instrument. The representations, warranties, covenants and obligations of the Company, and the rights and remedies that may be exercised by the Purchasers, shall not be limited or otherwise affected by or as a result of any information furnished to, or any investigation made by or knowledge of, any of the Purchasers or any of their representatives."

(Emphasis added.)

66. The Note Purchase Agreement further provided that the Pre-IPO Investors had "ten (10) calendar days" from the date they received notice of the initial public offering ("IPO"), to convert the principal amount of their investment and any accrued interest into common shares of the Company ("Common Shares").

### The Company Uses the Pre-IPO Investors' Money to Close On Its Bridge Farm Transaction

67. On or about June 28, 2019, the Company held a teleconference with investors. Among other things, the Company represented that it was on schedule to close with Bridge Farm, which was currently growing 40,000 hemp plants and would be growing close to 200,000 hemp plants in the near future.

68. On or about July 2, 2019, Defendants closed the Bridge Farm Acquisition -- the total purchase price of which was reported to be C$146,632,000 – and paid Bridge Farm's then majority owner and Chief Executive Officer, C$78,172,703.

69. To the extent Defendants were unaware of it beforehand, Defendants knew (or should have known) prior to closing the Bridge Farm Acquisition that Bridge Farm did not have the necessary licenses to (i) "allow[] for the cultivation, processing and export of finished goods

from the UK," (ii) "enable the Company to produce and distribute at scale almost immediately and more quickly than competitors", and/or (iii) generate anywhere close to C$79.5 million in EBITDA in 2020.

### The Company's Initial Public Offering and Defendants' Failure to Correct Their Prior Misrepresentations Regarding Bridge Farm's Licensing Status

70.     As set forth above, the Company's senior executives (including the Individual Defendants) had a clear and nefarious motive to complete the Company's IPO as soon as possible in order to maximize the value of their personal holdings.

71.     In that vein, and in an effort to launch its IPO as quickly as possible, the Company filed a Registration Statement on Form F-1 with the United States Securities and Exchange Commission (the "SEC") on or about July 5, 2019 (the "Registration Statement").

72.     The Company subsequently amended its Registration Statement on July 23, 2019 and July 30, 2019 respectively.

73.     The Individual Defendants each signed the Registration Statement and the Amended Registration Statements (the Registration Statement and Amended Registration Statements are hereinafter referred to as the "Registration Statements").

74.     Notably, the Registration Statements did not correct or retract any of the material representations or omissions that Defendants had previously made in connection with the Pre-IPO Round.

75.     Thus, the same representations that the Company had made in the Offering Documents concerning Bridge Farm's assets and the benefits of the Acquisition remained unaltered.

76.     Among the "Risk Factors" set forth in the Registration Statements, the Company did not reveal that it **_required additional licenses_** to produce or cultivate hemp or CBD in the

commercial manner that it had previously represented to investors (including Plaintiffs), and to achieve the "first-mover" status Defendants had repeatedly referenced in the January and Spring Investor Presentations.

77.     Instead, the Company stated in its Risk Factors that:

> Bridge Farm currently holds a ***hemp cultivation licence*** [sic] granted by the U.K. Home Office at one of its facilities and cultivates hemp in a portion of this facility. This license was granted on December 28, 2018 and is set to expire on December 31, 2021, and we intend to seek renewal of this licence  [sic] with the U.K. Home Office prior to its expiry. The renewal application is submitted online  [sic] and it takes approximately two to four weeks for the U.K. Home Office to review the application and issue its decision. Should the U.K. Home Office not renew or delay the renewal of our licence  [sic], or renew our licence  [sic] on different terms, our ability to recognize the strategic objectives of our acquisition of Bridge Farm could be materially adversely affected.

(Emphasis added.)

78.     On August 1, 2019, the Company filed its Prospectus with the SEC, pursuant to which it made its initial public offering ("IPO") of Sundial's common stock.

79.     Like the Registration Statements that preceded it, the Prospectus (i) did not correct any of the material misrepresentations or omissions that Defendants previously made in the Offering Documents, and (ii) did not mention that Bridge Farm lacked the requisite licenses to cultivate, process and export hemp or CBD products in a commercial manner so as to reach the Company's projected 2020 revenue and EBITDA targets.

80.     Like the Registration Statements, the Prospectus failed to correct the prior misstatements. For example, the Prospectus discussed various risk factors to Sundial's business but made no mention of Bridge Farm needing to obtain new licenses to conduct its business.

81.     In addition, the Prospectus (like the Registration Statements) only addressed the renewal of Bridge Farm's current license, not the need to obtain more licenses.  That is, the

Prospectus did not contain any forewarning about Bridge Farm needing to obtain future hemp licenses in order to cultivate, process and/or distribute hemp to the EU.  As a result, the Prospectus reinforced Defendants' earlier misrepresentations that Bridge Farm possessed the licenses necessary to cultivate, process, and export hemp or CBD products.

82.     Pursuant to the Prospectus, the Company offered 11,000,000 shares of Sundial's common stock at an initial price of $13.00 per share.

83.     As a result of the Company's IPO, the Company netted approximately U.S. $134.4 million.

84.     Because Defendants had still not corrected any of their material misrepresentations or omissions, E-Squared requested – and received – a significant allocation of the IPO shares.

85.     Specifically, E-Squared received 140,000 shares worth $1.82 million.

86.     In addition, on or about August 12, 2019 (while Defendants' misrepresentations remained unknown and uncorrected), Plaintiffs elected to convert their notes into shares of the Company's common stock ("Plaintiffs' Election").

87.     Pursuant to the terms of the Convertible Notes, Plaintiffs converted their notes into common shares at C$13.84/share.

88.     Plaintiffs, however, were prohibited from selling their shares for at least six months from the IPO.

### *Defendants' Misrepresentations about the Bridge Farm License Are Revealed*

89.     On or about August 14, 2019 (*i.e.*, two days after Plaintiffs' Election), the Company held an investor call to report its Second Quarter financial results.

90.     During that call, Tamy Chen, from BMO (one of the Company's placement agents on the Pre-IPO and IPO Rounds) stated "I know that there's a couple of licenses ***you're waiting***

*for* before you can start really converting and growing hemp at Bridge Farm's facilities."

91.     Approximately 12 days thereafter, on or about August 26, 2019, BMO's research analyst issued a note stating that "Bridge Farm *requires key licenses* and we expect there will be a natural ramp and learning curve associated with the conversion of Bridge Farm's greenhouses from growing herbs and ornamental flowers to growing hemp." (Emphasis added.)

92.     Similarly, Cowen's research analyst noted that "we are conservatively forecasting that CBD sales *do not begin until* 2020.  At that time, we estimate SNDL will generate revenue of C$98 mm in 2020, growing to C$243 mm in 2021 as the company looks to more than double its growing square feet in the U.K. and generate improved price/mix from increased sales of finished goods vs. raw biomass."

93.     In other words, almost immediately after BMO and Cowen initiated coverage on the Company, both banks reported that the Company could not – as it had represented to Plaintiffs and other Pre-IPO Round Investors – use Bridge Farm to (i) "allow[] for the cultivation, processing *and export of finished goods* from the UK," (ii) "enable the Company to *produce and distribute at scale almost immediately and more quickly than competitors*", and/or (iii) generate anywhere close to C$239.3 million in revenue and C$79.5 million in EBITDA in 2020.

94.     On August 16, 2019, the price of the Company's common stock opened at $10.54 per share.  After BMO and Cowen's disclosures revealed that Bridge Farm did not possess the licenses that the Company had claimed it had, the price of the Company's common stock declined approximately 25% by the end of August.

95.     On or about October 18, 2019, BMO's representatives visited Bridge Farm's facilities and further confirmed that Defendants had blatantly misrepresented material information concerning the status and value of Bridge Farm's hemp-related licenses while soliciting investors

for the Pre-IPO Round.

96.     Specifically, BMO discovered that Bridge Farm was only growing hemp in a "limited capacity under an industrial hemp license. This license ***does not allow the hemp to be sold or the flowers of the plants to be extracted for CBD***." (*Compare with* Defendants' claim in the January Investor Presentation: "Hemp license allows for cultivation, processing, and export of finished product from the UK.")

97.     Again, BMO's disclosure could not be reconciled with Defendants' prior representations that the Bridge Farm Acquisition would allow them to be a "first-mover" in  the EU's market for hemp products, and that it would confer significant and immediate financial windfalls upon the Company in 2020.

98.     BMO further noted that Bridge Farm "has applied for an R&D license that would allow the extraction of CBD to make over-the-counter CBD products from cannabis plants. . . . Following receipt of the R&D license, [Bridge Farm] will apply for a commercial cannabis cultivation license."

99.     Moreover, BMO reported that there was no indication as to if, or when, Bridge Farm would receive the necessary licenses to extract CBD and/or to make over-the-counter CBD products.

100.     On November 14, 2019, the Company held its third-quarter 2019 results conference call with investors (the "Q3 2019 Earnings Call").

101.     During the Q3 2019 Earnings Call, the Company revealed that it was "working with the [Home Office] very closely on the multi-step licensing process and starting with the R&D license.  We . . . are expecting to get that license over the line by the end of Q4, and then we will progress to apply for the license at Clay Lake in early 2020. . . . And in the meantime, while we

wait for our own cultivations [to] come on stream, we are pursuing a potential product launches [sic] and potential product introductions using imported CBD oils from trusted source from Europe."

102. The Company (through its CEO, Kuenzlen) further elaborated that he expected CBD sales from outside providers and the cultivation of CBD to occur in 2020. As Kuenzlen made clear "[I]t won't be December, so I think the middle of the year is probably *a fair point at this point to raise in terms of being able to begin commercialization of CBD products in the U.K.*" (Emphasis added.) Kuenzlen's statements were completely at odds with what he and the other Defendants had purposefully led Plaintiffs and other investors to believe throughout the Pre-IPO Round.

103. In or around that same time period, Cowen confirmed that the Company "continues to work with the U.K. regulators for its multi-step CBD license, as it anticipates receiving its R&D license by end of 4Q19. While the company *awaits its own cultivation license to come online*, it is pursuing potential product launches using imported CBD oils from trusted partners in Europe. *However, management does not anticipate being able to commercialize CBD products until mid-2020*." (Emphasis added.)

104. In other words, the Company's representations that it possessed a hemp license and that it would be able to generate more than C$230 million in revenue in 2020 from hemp and CBD sales were false and materially misleading when made because Defendants knew that the Company did not then possess the necessary licenses to cultivate, process and export hemp and/or CBD.

105. In reporting its Fourth Quarter earnings for 2019, the Company revealed that its net loss for the three months ending December 31, 2019 was C$145.1 million.

106. The Company claimed that the magnitude of its net loss from the Third Quarter to

the Fourth Quarter of 2019 was "primarily due to the impact of a ***non-cash impairment charge of***

***$100.3 million related to the goodwill recorded upon the acquisition of Bridge Farm***." (Emphasis

added.)

107.    In other words, the Bridge Farm Acquisition was not as valuable to the Company's

business as Defendants had purposefully led Plaintiffs to believe.  This disparity was due to the

fact that Bridge Farm lacked the necessary licenses to make good on Defendants' promises of a

first-mover advantage in the European Union's market for hemp products.

108.    Upon information and belief, the Company's accountants determined – after

Plaintiffs' Election – that (i) the goodwill the Company had attributed to the purchase price for

Bridge Farm (*i.e.*, more than $127 million) was grossly inflated above Bridge Farm's fair market

value, and/or (ii) Bridge Farm's ability to generate cash flows deteriorated such that the fair value

of Bridge Farm's goodwill dipped below its book value.

109.    Defendants knew (or should have known) that the Company was grossly

overpaying for Bridge Farm, and that the goodwill it was attributing to Bridge Farm was grossly

inflated, including because Defendants knew (or should have known) that Bridge Farm did not

possess the necessary licenses to cultivate, process and export hemp or CBD in a commercial

manner.

110.    In fact, BMO and Cowen only required a few weeks to determine that the Company

did not have the necessary licenses to cultivate, process and export hemp or CBD in a commercial

way so as to realize the revenues and EBITDA that Defendants had represented in the January and

Spring Presentations.

111.    On March 30, 2020, the Company finally conceded its mistake and stated in a press

release that it intended to enter into a definitive agreement to sell Bridge Farm on or before April

15, 2020.

112.     The Company has since twice announced that it had pushed back the April 15, 2020

deadline – first to April 30, 2020 and then to May 11, 2020.

### *The Company's Freefall Continues*

113.     On February 3, 2020, just six months after the IPO, the Company announced that

its "core management team" had left the Company as of January 30, 2020.

114.     Specifically, the Company announced that Kuenzlen (the CEO) and Harriman (the

COO) both left the Company.

115.     The Company further announced that Hellard would be stepping down from his

operational role in the Company.

116.     After the "core management team" resigned, the Company's stock plummeted

50%, sending the Company's market cap to roughly $133 million, a decline of roughly 87% from

the valuation of the IPO.

117.     The Company also represented, among other things, that its performance since its

IPO was negatively affected by, among other things, "a number of internal and external challenges,

including operational difficulties, excess leverage, poor cost controls, a loss of focus on our core

value proposition, regulatory delays, and rapidly evolving industry conditions."

118.     On April 29, 2020, the Company's stock closed at U.S.$0.50 per share, more than

95% below its $13.00 original list price.

### *No Safe Harbor Applies Here*

119.     The statutory safe harbor provided for forward-looking statements under certain

circumstances does not apply to any of the allegedly false statements set forth above because they

were not identified as "forward-looking statements" when made, and because any alleged "forward

looking statements" by Defendants were made in bad faith, because Defendants knew at the time that the forward looking statements were premised on material misrepresentations concerning the Bridge Farm Acquisition.

120.   To the extent any forward looking statements were identified as such, those "forward looking statements" included present-day facts.  For example, the Company's ability to generate more than C$230 million of revenues and C$79.5 million in EBITDA from the Bridge Farm Acquisition assumed that Bridge Farm already possessed the necessary licenses to cultivate, process and distribute hemp and CBD.

121.   But as set forth above, the Company did not have the necessary licenses to cultivate, process or distribute hemp or CBD at the time it offered those economic projections.

122.   In addition, Defendants did not provide any meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

123.   As just one example, Defendants never stated (in writing or otherwise) that the Company's success or failure was dependent upon the acquisition of additional licenses to cultivate, process and/or export hemp or CBD in the EU.  To the contrary, Defendants continued to re-enforce their misrepresentations concerning the status of Bridge Farm's hemp license and its supposed benefits to the Company.

124.   Even if the statutory safe harbor did apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false when made.

125.   Indeed, given that Defendants knew that Bridge Farm did not have the requisite

licenses to cultivate, process and/or export hemp or CBD in a commercial manner, Defendants could not legitimately claim that their revenue and EBITDA projections for the Bridge Farm Acquisition were true (or even reasonable) when made.

## CLAIMS FOR RELIEF

### AS AND FOR THE FIRST CAUSE OF ACTION
(Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder)
(Against All Defendants)

126.     Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 125 as if fully set forth herein.

127.     Defendants, directly or indirectly, singly or in concert with others, in connection with the purchase and sale of securities, by use of the means and instrumentalities of interstate commerce and by use of the mails have (i) engaged in acts, practices and courses of business which operate as a fraud and deceit upon purchaser, prospective purchasers and other persons, in connection with the Pre-IPO Round and IPO, (ii) employed devices, schemes and artifices to defraud, and (iii) made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

128.     Defendants knew prior to Plaintiffs' investment, and have known since Plaintiffs' investment, that Bridge Farm did not have the requisite licenses to cultivate, process and export hemp or CBD from the UK, and knowingly or recklessly disregarded their duty to provide accurate information, and correct false information, to Plaintiffs and the investing public.

129.     As set forth above and incorporated herein, Defendants engaged in a scheme to deceive Plaintiffs and the market, and a course of conduct that duped Plaintiffs into investing in the Company.

130.    As a result of Defendants' misconduct, Plaintiffs suffered monetary damages.

131.    Defendants approved and controlled the misrepresentations alleged above and the failure to correct the information.

132.    Defendants benefited from their failure to correct the material misrepresentations and/or omissions alleged above as because (i) but for Defendants' misrepresentations, Plaintiffs would not have invested in the Company, and (ii) Defendants needed to close the Pre-IPO Round in order to quickly take the Company public and maximize their own holdings in the Company.

133.    By engaging in the foregoing misconduct, Defendants violated Section 10(b) and 10b-5.

134.    As a result of Defendants' misconduct, Plaintiffs suffered damages in an amount to be determined at trial, but in no event less than $1 million as well as prejudgment interest.

## AS AND FOR THE SECOND CAUSE OF ACTION
(Violations of Section 15 of the Securities Act)
(Against the Individual Defendants)

135.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 134 as if fully set forth herein.

136.    At all relevant times, the Individual Defendants were controlling persons of the Company by virtue of their positions as senior officers of Sundial and, at the time of the wrongs alleged herein.

137.    The Individual Defendants, during the Pre-IPO Round and at the time of the IPO, participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the Company's business affairs.

138.    As senior officers of the Company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company, financial condition,

25

and results of operations.

139.     The Individual Defendants participated in the preparation and dissemination of the Offering Documents, Registration Statement, and otherwise participated in the process necessary to conduct the Pre-IPO Round and IPO.

140.     Because of their positions of control and authority as senior officers of the Company, the Individual Defendants were able to, and did, control the contents of the Offering Documents and Registration Statement, which contained materially untrue information and failed to identify appropriate risk factors.

141.     By reason of the aforementioned misconduct, the Individual Defendants are liable under Section 15 of the Securities Act.

142.     As a result of the Individual Defendants' misconduct, Plaintiffs suffered damages in an amount to be determined at trial, but in no event less than $1 million as well as prejudgment interest.

### AS AND FOR THE THIRD CAUSE OF ACTION
(Violations of Section 12(a)2 of the Securities Act)
(Against the Individual Defendants)

143.     Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 142 as if fully set forth herein.

144.     The Company's Registration Statements and Prospectus omitted material facts concerning the quality of the Company's product and the licenses possessed by Bridge Farm.

145.     The Individual Defendants successfully solicited Plaintiffs to purchase the Company's shares and were motivated in part by their own financial interest.

146.     In reliance on the Company's filings, the Individual Defendants' solicitation and without knowledge of the Company's material omissions set forth above, E-Squared invested

$1.82 million in the Company's IPO.

147.   Not long after E-Squared invested in the Company, the Company revealed that it did not possess the necessary licenses to cultivate, process and sell hemp and/or CBD in the UK and abroad.

148.   As a result, the stock price dropped well below the $13.00 IPO price paid by Plaintiffs.

149.   Accordingly, E-Squared has the right to rescind and recover consideration paid for its shares, or to recover rescissory or other damages to the maximum extent permitted by law, and hereby tenders (to the extent tender is required) its shares.

## AS AND FOR THE FOURTH CAUSE OF ACTION
(Breach of Contract)
(Against the Company)

150.   Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 149 as if fully set forth herein.

151.   Plaintiffs and the Company entered into the stand-alone Note Purchase Agreement, which is a binding and enforceable agreement.

152.   As set forth above, the Company represented in the Note Purchase Agreement that:

> Neither this Agreement . . . the investor presentation dated "Spring 2019" . . . nor any other document delivered by the Company to Purchasers . . . contain (i) any untrue statement of material fact or omit to state a material fact necessary in order to make the statements contained herein or therein not misleading, or (ii) any misrepresentation within the meaning of Canadian securities laws.

153.   Plaintiffs reasonably relied on the representations in the Note Purchase Agreement in connection with making their investment in the Company.

154.   Pursuant to the terms of the Note Purchase Agreement, Plaintiffs ultimately invested approximately $7 million in the Company.

155.    As set forth above, the representations in the Note Purchase Agreement were false and misleading when made, including because the Company did not have the necessary licenses to cultivate, process and export hemp throughout the EU.

156.    Accordingly, the Company breached the Note Purchase Agreement.

157.    At all times relevant hereto, Plaintiffs performed their obligations under the Note Purchase Agreement.

158.    As result of the Company's breach of the Note Purchase Agreement, Plaintiffs have suffered damages in an amount to be proven at trial, but in no event less than $7 million as well as prejudgment interest.

## AS AND FOR THE FIFTH CAUSE OF ACTION
(Fraud in the Inducement)
(Against All Defendants)

159.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 158 as if fully set forth herein.

160.    Prior to Plaintiffs signing the Note Purchase Agreement, Defendants misrepresented material facts concerning (i) Bridge Farm's ability to cultivate, process and export hemp and CBD from the UK, and (ii) the quality of the Company's product which Defendants knew to be false representations of present fact when they were made.

161.    Defendants made these misrepresentations and/or omitted material information with the sole intent to induce Plaintiffs into entering the Note Purchase Agreement and invest in the Company.

162.    Plaintiffs reasonably relied on Defendants' misrepresentations and omissions and, but for Defendants' misrepresentations and omissions, would not have entered into the Note Purchase Agreement or converted their notes into common shares.

163.    As a result of Defendants' misrepresentations, Plaintiffs suffered damages in the amount to be determined at trial, but in no event less than $7 million as well as prejudgment interest.

164.    In addition, Defendants' conduct was wanton and egregious, and merits an award of punitive damages, including because (i) Defendants knew that Bridge Farm lacked the necessary licensing and was incapable of meeting the production requirements to earn anywhere close to C$225 million in revenues in 2020, (ii) Defendants nevertheless included their false and misleading Bridge Farm statements in the January Investor Presentation and the Spring Investor Presentation because Bridge Farm's "story" made the Company more attractive to investors, and (iii) Defendants acted out of their own self-interest to mislead investors and complete the Company's IPO sooner rather than later because the more quickly the Company completed its IPO, the less dilution the Individual Defendants suffered.

## AS AND FOR THE SIXTH CAUSE OF ACTION
(Negligent Misrepresentation)
(Against Individual Defendants)

165.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 164 as if fully set forth herein.

166.    As set forth above and incorporated herein, the Individual Defendants sought out Plaintiffs to invest in their Pre-IPO Round and worked over a considerable period of time to establish a close degree of trust with Plaintiffs in order to convince Plaintiffs to invest in the Company.

167.    The Individual Defendants had a confidential or fiduciary relationship giving rise to a duty to speak with care where the Individual Defendants expected Plaintiffs to rely upon their statements as to the existence of licenses at Bridge Farm, the Company's financial projections, and

the quality of the Company's product.

168.    Plaintiffs had limited information that only the Individual Defendants were privy too, namely (i) the information concerning Bridge Farm's licenses, (ii) the Company's financial information, and (iii) the quality of the Company's product.

169.    Because Plaintiffs had limited information on the aforementioned issues, Plaintiffs reasonably relied upon the Individual Defendants' representations for assurance before investing in the Company.

170.    As a result of Plaintiffs' reliance on the Individual Defendants' representations, Plaintiffs suffered damages in the amount to be determined at trial, but in no event less than $7 million and prejudgment interest.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully requests that this Court enter judgment against Defendants as follows:

i)      On the First Cause of Action for violation of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder, awarding Plaintiffs compensatory damages against Defendants, in an amount to be determined at trial but in no event less than $1 million, including interest thereon;

ii)     On the Second Cause of Action for violations of Section 15 of the Securities Act, awarding Plaintiffs compensatory damages against Defendants, in an amount to be determined at trial but in no event less than $1 million as well as interest thereon;

iii)    On the Third Cause of Action for violations of Section 12(a)(2) of the Securities Act, awarding E-Squared compensatory damages against Defendants in an amount to be determined at trial but in no event less than $1.82 million as well as interest thereon;

iv)     On the Fourth Cause of Action for Breach of Contract, awarding Plaintiffs compensatory damages against Defendants, in an amount to be determined at trial but in no event less than $7 million as well as interest thereon;

v)      On the Fifth Cause of Action for Fraud in the Inducement, awarding Plaintiffs (x) compensatory damages against Defendants, in an amount to be determined at trial

but in no event less than $7 million as well as interest thereon and punitive damages;

vi)     On the Sixth Cause of Action for Negligent Misrepresentation; awarding Plaintiffs compensatory damages against Defendants, in an amount to be determined at trial but in no event less than $7 million as well as interest thereon;

vii)    Awarding Plaintiffs all costs and expenses incurred in connection with this action, including counsel fees, expenses and expert fees; and

viii)   Awarding Plaintiffs such other relief as the Court may deem just and proper.

## <u>JURY TRIAL DEMANDED</u>

Plaintiffs hereby demand a trial by jury.

Dated: New York, New York
       January 8, 2021

Respectfully submitted,

**FEUERSTEIN KULICK LLP**

By:  _/s/ David Feuerstein_____
David Feuerstein
Richard Trotter
810 Seventh Avenue, 34th Floor
New York, New York 10019
Tel: (646) 793-3613
david@dfmklaw.com
rich@dfmklaw.com

*Attorneys for Plaintiffs SUN, A Series of E-Squared Investment Fund, LLC, E-Squared Capital Fund LLC, LLC, S.H.N Financial Investments Ltd., Flamingo Drive M&M, LLC and Stable Road Capital,*