USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#: _____
DATE FILED: ___09/30/2021___

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------- x
**SUN, A SERIES OF E SQUARED INVESTMENT** :
**FUND, LLC, ET AL.,** :
:
                                   **Plaintiffs,** :      **1:20-CV-03579 (ALC)**
:
        **-against-** :      **OPINION & ORDER**
:
**SUNDIAL GROWERS INC., ET AL.,** :
:
                                   **Defendants.** :
:
-------------------------------------------------------------------- x

**ANDREW L. CARTER, JR., United States District Judge:**

       Plaintiffs SUN, A Series of E-Squared Investment Fund, LLC ("SUN"), E-Squared

Capital Fund, L.P. ("E-Squared"), S.H.N Financial Investments Ltd. ("SHN"), Flamingo Drive

M&M, LLC ("Flamingo"), and Stable Road Capital, LLC ("Stable Road") (collectively,

"Plaintiffs"), bring this action against Sundial Growers Inc. ("Sundial" or the "Company"),

Edward Hellard, and Torsten Kuenzlen (collectively, "Defendants"), alleging that Defendants

committed securities fraud in violation of Section 10(b) of the Securities Exchange Act of 1934

(the "Exchange Act"), Securities and Exchange Commission ("SEC") Rule 10(b)-5, and Sections

12(a)(2) and 15 of the Securities Act of 1933 (the "Securities Act"). Plaintiffs also assert claims

for breach of contract, fraud in the inducement, and negligent misrepresentation.[1]

       Defendants moved to dismiss the complaint pursuant to Rules 12(b)(2), 12(b)(6) and 9(b)

of the Federal Rules of Civil Procedure and the Private Securities Litigation Reform Act of 1995

(the "PSLRA"), 15 U.S.C. § 78u-4(b). For the reasons set forth below, Defendants' motion to

dismiss is **GRANTED**.

---

[1] Plaintiffs initially also asserted claims against Gregory Turnbull, Lee Tamkee, and Elizabeth Cannon. On
November 12, 2020, these defendants were voluntary dismissed with prejudice. ECF No. 17.

**BACKGROUND**

I.      **Factual Background**

The following facts are taken from the allegations contained in the First Amended Complaint ("FAC"), ECF No. 21, which are presumed to be true for purposes of this motion to dismiss.

**A.  The Parties**

Plaintiff E-Squared is an investment fund with its principal place of business in New York. FAC ¶ 13. Plaintiff SUN is a single purpose entity with its principal place of business in Utah. *Id.* ¶ 14. Plaintiff SHN is a hedge fund with its principal place of business in Israel. *Id.* ¶ 15. Plaintiff Flamingo is a limited liability company formed under the laws of Delaware with its principal place of business located in Florida. *Id.* ¶ 16. Plaintiff Stable Road is a limited liability company formed under the laws of California with its principal place of business in California. *Id.* ¶ 17.

Defendant Sundial is a licensed producer of cannabis products with its principal place of business in Alberta, Canada. FAC ¶ 18. Defendant Hellard was, during all relevant times, the Executive Chairman of Sundial. FAC ¶ 19. Upon information and belief, Defendant Hellard was, during the relevant period, the largest shareholder, and was at the time of the filing of the First Amended Complaint, Chair of Sundial's Mergers and Acquisition Committee. *Id.* Upon information and belief, Defendant Hellard resides in Alberta, Canada. *Id.* Defendant Kuenzlen was Sundial's Chief Executive from February 2018 to February 2020. *Id.* ¶ 20. Upon information and belief, Defendant Kuenzlen also resides in Alberta, Canada. *Id.*

**B. Sundial's Pre-IPO**

After the legalization of cannabis in Canada in October 2018, Sundial sought to raise funds prior to its initial public offering ("IPO"). FAC ¶ 31. Specifically, Sundial was seeking to raise US$50 million to fund the acquisition of Bridge Farm. *Id.* On or about January 24, 2019, individual members of Plaintiffs met with Defendant Kuenzlen and the Company's Chief Financial Officer ("CFO") in Toronto, Canada. *Id.* ¶ 30. At this meeting, the Company provided individual members of Plaintiffs with a presentation outlining the Company's current and future operations ("January Investor Presentation"). *Id.* Specifically, the January Investor Presentation provided that Bridge Farm had a "[h]emp license allow[ing] for cultivation, processing, and export of finished product from the UK." Feuerstein Decl. Ex. 2 ("January Investor Presentation") at 27. It further provided that Bridge Farm would "provide[] platform for scalable growth with only ~C$20 mm in incremental Capex needed to facilitate CBD production and extraction" and that the "[o]peration enables us to produce and distribute at scale almost immediately and more quickly than competitors." *Id.* At the time, they expected Bridge Farm to generate C$256 million in revenue and C$115 million of EBITDA in 2020. January Investor Presentation at 29, 35.

Shortly thereafter, the parties began discussing the terms related to Plaintiff's potential investment in the Company. FAC ¶ 37. Before any terms were agreed upon or finalized, Sundial released a new investor presentation (the "Spring Investor Presentation"). *Id.* ¶ 38. This presentation indicated that the Company was seeking to raise C$70 million to fund the Bridge Farm acquisition. *Id.* ¶ 39. Further, it highlighted that their "fully operational UK facility [Bridge Farm] w[ould] enable [them] to be the first-mover in mass-scale, global hemp-derived CBD products" and that Bridge Farm had a hemp cultivation license. Feuerstein Decl. Ex. 3 ("Spring

Investor Presentation") at 29. It also indicated, in a footnote, that Bridge Farm currently produced ornamental plants and that "[h]emp [was] not currently being grown for sale" and that the acquisition of Bridge Farm had not yet closed. *Id.* The Spring Investor Presentation laid out the terms of the offering, specifically that it would be in the form of convertible unsecured promissory notes wherein the holder would have the option to convert the notes into common shares upon a qualifying IPO at a discount depending on when the IPO occurred. Spring Investor Presentation at 2. The discount would increase the later the qualifying IPO occurred. *Id.* The Spring Investor Presentation 2020 financial projections were substantially similar to those presented in the January Investor Presentation: C$239.3 million in revenue and C$79.5 million in EBITDA. Spring Investor Presentation at 39.

Plaintiffs allege that Defendants "knew (or should have known)" that Bridge Farm did not possess the necessary hemp license that would allow it to produce and cultivate hemp in a commercial manner and to distribute hemp or CBD "at scale almost immediately and more quickly" than competitors such that they would generate hundreds of millions of dollars. FAC ¶¶ 49-51. In the next few months, Defendants and their agents continued to make similar statements regarding Bridge Farm's licensing status and operational capabilities, specifically that "Bridge Farm is a fully functional, licensed facility that will allow the [C]ompany to be a first mover in the mass scale, global hemp-derived CBD product market." *Id.* ¶ 54 (March 2019 statement by Cowen, the Company's placement agent); *see also id.* ¶ 57 (same statement by BMO, co-placement agent, made in April 2019). Around the same time, Defendant Kuenzlen and Sundial's CFO came to New York and met with the principals of E-Squared (and others) to discuss the potential investment in the Company and reiterated many of the same points in the Spring Investment Presentation. *Id.* ¶¶ 55-56.

Ultimately, Plaintiffs agreed to invest approximately $7 million in the pre-IPO round. FAC ¶ 59.

## C. Sundial's IPO

On or about July 5, 2019, Sundial filed a Registration Statement on Form F-1 (the "Registration Statement") with the Securities and Exchange Commission ("SEC"). FAC ¶ 71. This Registration Statement was subsequently amended on July 23, 2019 and July 30, 2019. *Id.* ¶ 72. The Individual Defendants each signed the Registration Statement and subsequent amendments (collectively, "Registration Statements"). *Id.* ¶ 73. The Risk Factors stated that Bridge Farm currently held a hemp cultivation license which was set to expire on December 31, 2021 and that Sundial would seek renewal of the license with the U.K. Home Office prior to its expiration. *Id.* ¶ 77. However, Sundial also warned that "[s]hould the U.K. Home Office not renew or delay the renewal of [their] licence [sic], or renew [their] licence [sic] on different terms, [their] ability to recognize the strategic of objectives of [their] acquisition of Bridge Farm could be materially adversely affected." *Id.*

On August 1, 2019, Sundial filed its Prospectus with the SEC, pursuant to which it made its IPO of Sundial's common stock. FAC ¶ 78. Pursuant to the Prospectus, Sundial offered 11,000,000 shares of Sundial's common stock at an initial price of $13.00 per share. *Id.* ¶ 82. As a result, the Company made approximately US$134.4 million. *Id.* ¶ 83. E-Squared received 140,000 shares worth $1.82 million. *Id.* ¶ 85. On or about August 12, 2019, Plaintiffs elected to convert their notes into shares at C$13.84 per share. *Id.* ¶ 87. Plaintiffs were prohibited from selling their shares for at least six months. *Id.* ¶ 88.

**D.  Post-Sundial IPO**

On August 14, 2019, Sundial held an investor call where Tamy Chen, from BMO (one of Sundial's placement agents on both pre-IPO and IPO rounds) stated "I know that there's a couple of licenses you're waiting for before you can start really converting and growing hemp at Bridge Farm's facilities." FAC ¶ 90. On or about August 26, 2019, BMO's research analyst issued a note stating that "Bridge Farm requires key licenses and we expect there will be a natural ramp and learning curve associated with the conversion of Bridge Farm's greenhouses from growing herbs and ornamental flowers to growing hemp." *Id.* ¶ 91. Cowen's research analyst noted that they were "conservatively forecasting that CBD sales do not begin until 2020. At that time, we estimate SNDL will generate revenue of C$98 mm in 2020, growing to C$243 mm in 2021 as the company looks to more than double its growing square feet in the U.K. and generate improved price/mix from increased sales of finished goods vs. raw biomass." *Id.* ¶ 92.

On August 16, 2019, the price of Sundial's common stock opened at $10.54 per share. By the end of August, the price of the Company's common stock had declined approximately 25%. FAC ¶ 94. Plaintiffs allege that in a visit to Bridge Farm's facilities in October 2019 BMO discovered that Bridge Farm was only growing hemp in a "limited capacity under an industrial hemp liencse" which did "not allow the hemp to be sold or the flowers of the plants to be extracted for CBD." *Id.* ¶¶ 95-96. BMO also noted that Bridge Farm had "applied for an R&D license that would allow the extraction of CBD to make over-the-counter CBD products from cannabis plants . . . Following receipt of the R&D license, [Bridge Farm] will apply for a commercial cannabis cultivation license." *Id.* ¶ 98. BMO also "reported that there was no indication as to if, or when, Bridge Farm would receive the necessary licenses to extract CBD and/or to make over-the-counter CBD products." *Id.* ¶ 99.

On November 14, 2019, Sundial held its third-quarter earnings call where it stated that it was "working with the [Home Office] very closely on the multi-step licensing process and starting with the R&D license. We . . . are expecting to get that license over the line by the end of Q4, and then we will progress to apply for the license at Clay Lake in early 2020 . . . And in the meantime, while we wait for our own cultivations [to] come on stream, we are pursuing a potential product launches [sic] and potential product introductions using imported CBD oils from [a] trusted source from Europe." FAC ¶ 101. Defendant Kuenzlen stated that he expected CBD sales from outside providers and the cultivation of CBD to occur in 2020: "it won't be December, so I think the middle of the year is probably a fair point at this point to raise in terms of being able to begin commercialization of CBD products in the U.K." *Id.* ¶ 102. Around the same time, Cowen stated that Sundial "continues to work with the U.K. regulators for its multi-step CBD license, as it anticipates receiving its R&D license by [the] end of 4Q19. While the Company awaits its own cultivation license to come online, it is pursuing potential product launches using imported CBD oils from trusted partners in Europe. However, management does not anticipate being able to commercialize CBD products until mid-2020." *Id.* ¶ 103.

During its fourth-quarter earnings call for 2019, Sundial reported that its net loss for that quarter was C$145.1 million which was "primarily due to the impact of a non-cash impairment charge of $100.3 million related to the goodwill recorded upon the acquisition of Bridge Farm." *Id.* ¶ 106. Plaintiffs allege, upon information and belief, that Sundial's accountants determined that "(i) the goodwill the Company had attributed to the purchase price for Bridge Farm . . . was grossly inflated . . . and/or (ii) Bridge Farm's ability to generate cash flows deteriorated such that the fair value of Bridge Farm's goodwill dipped below its book value." *Id.* ¶ 108.

On February 3, 2020, Sundial announced that its "core management team," including Defendant Kuenzlen, had left Sundial as of January 30, 2020. FAC ¶ 113-14. Sundial also announced that Defendant Hellard would be stepping down from his operational role in Sundial. After this occurred, the Company's stock dropped 50%, with a corresponding drop in Sundial's market cap to roughly $133 million, an 87% decline from the IPO valuation. *Id.* ¶ 116. The Company stated that its performance since the IPO was negatively affected by, *inter alia*, "a number of internal and external challenges, including operational difficulties, excess leverage, poor cost controls, a loss of focus on our core value proposition, regulatory delays, and rapidly evolving industry conditions." *Id.* ¶ 117.

On March 30, 2020, the Company announced that it planned to sell Bridge Farm on or before April 15, 2020, a deadline which was subsequently pushed back to May 11, 2020. FAC ¶¶ 111-12. On April 29, 2020, the Company's stock closed at U.S.$0.50 per share, more than 95% below its $13.00 original list price. *Id.* ¶ 118.

## II.    Procedural Background

Plaintiffs commenced the instant action on May 7, 2020. ECF Nos. 1, 6 ("Compl."). On January 8, 2021, Plaintiffs filed an Amended Complaint. ECF No. 21 ("FAC"). On February 12, 2021, Defendants filed a motion to dismiss and accompanying memorandum of law. ECF Nos. 24-25 ("Defs.' Mot."). On March 19, 2021, Plaintiffs filed an opposition to Defendants' motion. ECF No. 27 ("Pls.' Opp."). Defendants filed a reply memorandum in further support of their

motion to dismiss on April 9, 2021. ECF No. 30 ("Defs.' Reply"). Defendants' motion is deemed fully briefed.

### III.    Allegations in the Complaint

Plaintiffs allege that Defendants made false statements of material facts and concealed/omitted material facts regarding Bridge Farm's capabilities, specifically, that Bridge Farm had the requisite licenses to "cultivate, process and export" hemp and CBD from the UK. *See, e.g.*, FAC ¶¶ 59, 74, 79, 84, 104. Moreover, Plaintiffs assert that Defendants knew or should have known that Bridge Farm did not have the requisite licenses to "cultivate, process and export" hemp and CBD, and therefore they knew or should have known that Bridge Farm's acquisition would not result in Sundial's projected 2020 revenues and future growth. *Id.* ¶¶ 49, 51, 52, 69, 104, 109, 125, 128.

Plaintiffs also assert that Defendants' scienter is demonstrated by the fact that Defendants were "solely focused on maximizing their personal holdings and (i) were eager to complete the IPO sooner rather than later to avoid additional dilution, and (ii) believed that the Bridge Farm acquisition made the success of the Company's IPO more likely." FAC ¶ 52. In essence, Plaintiffs argue that because Defendant Hellard was the largest Sundial shareholder and Plaintiffs would be able to acquire Sundial common stock at more of a discount the more time passed, Defendants had a motive to misrepresent Bridge Farm's capabilities and acquire Bridge Farm. *Id.* ¶ 42.

### STANDARD OF REVIEW

### I.    Motions to Dismiss Under Fed. R. Civ. P. 12(b)(6)

To survive a motion to dismiss pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. (citing *Twombly*, 550 U.S. at 556). The plaintiff must allege sufficient facts to show "more than a sheer possibility that a defendant has acted unlawfully," and accordingly, where the plaintiff alleges facts that are "'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id*. (quoting *Twombly*, 550 U.S. at 557).

In considering a motion to dismiss, the court accepts as true all factual allegations in the complaint and draws all reasonable inferences in the plaintiff's favor. *See Goldstein v. Pataki*, 516 F.3d 50, 56 (2d Cir.), *cert. denied*, 554 U.S. 930 (2008). However, the court need not credit "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555); *see also id.* at 681. Instead, the complaint must provide factual allegations sufficient "to give the defendant fair notice of what the claim is and the grounds upon which it rests." *Port Dock & Stone Corp. v. Oldcastle Ne., Inc.*, 507 F.3d 117, 121 (2d Cir. 2007) (citing *Twombly*, 550 U.S. at 555). In addition to the factual allegations in the complaint, the court also may consider "the documents attached to the complaint as exhibits, and any documents incorporated in the complaint by reference." *Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.*, 602 F.3d 57, 64 (2d Cir. 2010) (citation and internal quotation marks omitted); *see also ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

II.      **Motions to Dismiss Under Fed. R. Civ. P. 9(b) and the PLSRA**

When a plaintiff has alleged fraud claims under § 10(b) of the Exchange Act, the complaint is subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act of 1995 (the "PSLRA"). Rule 9(b) requires that the complaint "state with particularity the circumstances constituting fraud or mistake." To satisfy the particularity requirement, a complaint must "(1) detail the statements (or omissions) that the plaintiff contends are fraudulent, (2) identify the speaker, (3) state where and when the statements (or omissions) were made, and (4) explain why the statements (or omissions) are fraudulent." *Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co.*, 375 F.3d 168, 187 (2d Cir. 2004) (citation and internal quotation marks omitted).

The PSLRA holds private securities plaintiffs to an even more stringent pleading standard. Under the PSLRA, a plaintiff must "(1) specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading" and "(2) state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 321 (2007) (internal citations and quotation marks omitted) (quoting 15 U.S.C. § 78u-4(b)). To determine that an inference of scienter is strong, the court must decide whether "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324.

"[T]he heightened pleading standard of Rule 9(b) applies to Section 11 and Section 12(a)(2) claims insofar as the claims are premised on allegations of fraud." *Rombach v. Chang*, 355 F.3d 164, 171 (2d Cir. 2004). As the Second Circuit has explained, "[b]y its terms, Rule 9(b) applies to 'all averments of fraud.' This wording is cast in terms of the conduct alleged, and is

not limited to allegations styled or denominated as fraud or expressed in terms of the constituent elements of a fraud cause of action." *Id*. "The same course of conduct that would support a Rule 10b-5 claim may as well support a Section 11 claim or a claim under Section 12(a)(2). So while a plaintiff need allege no more than negligence to proceed under Section 11 and Section 12(a)(2), claims that do rely upon averments of fraud are subject to the test of Rule 9(b)." *Id*.

## DISCUSSION

Defendants assert that the FAC fails to state a claim for securities fraud for six principal reasons. First, Defendants argue that the FAC does not adequately plead any material misrepresentations or omissions, especially in light of the cautionary disclosures provided. Second, Defendants contend that Plaintiffs' allegations are not sufficient to raise a "strong inference" of scienter, and that Defendants do not adequately plead reliance or loss causation. Third, Defendants assert that Plaintiffs' Exchange Act claim against Defendant SHN must be dismissed as extraterritorial, and that the Exchange Act claims against Defendants Hellard and Kuenzlen must be dismissed because Plaintiffs lack standing to assert claims against these defendants. Fourth, Defendants argue that because Plaintiffs' complaint fails to state primary violations of the Securities Act, then Plaintiffs' claim under Section 15 of the Securities Act must be dismissed. Fifth, Defendants contend that because Plaintiffs fail to state either an Exchange Act or Securities Act claim, the Court should decline supplemental jurisdiction over Plaintiffs' state claims. Lastly, Defendants argue that the Court does not have personal jurisdiction over Defendant Hellard, a resident of Canada.

## I.    Section 10(b) of the Securities Exchange Act and SEC Rule 10b-5

Plaintiff asserts a securities fraud claim against Defendants under § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. FAC ¶¶ 126-34. "In a typical § 10(b)

private action a plaintiff must prove (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 157 (2008) (internal citation omitted); *see also ATSI Commc'ns*, 493 F.3d at 105 (internal citation omitted). Defendants' motion to dismiss challenges the first, second, fourth, and sixth factors.

### A.  Plaintiff Has Not Alleged a Material Misrepresentation or Omission

A violation of Section 10(b) and Rule 10b-5 premised on misstatements cannot occur unless an alleged material misstatement was false at the time it was made. *See San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos., Inc.*, 75 F.3d 801, 812-13 (2d Cir. 1996). A statement believed to be true when made, but later shown to be false, is insufficient. *Id.* (explaining that "plaintiffs have not alleged circumstances to show that the defendants lacked a reasonable basis for their optimistic, but qualified, predictions as to the company's future performance"); *see Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir.) ("refus[ing] to allow plaintiffs to proceed with allegations of 'fraud by hindsight.' Corporate officials need not be clairvoyant; they are only responsible for revealing those material facts reasonably available to them." (internal citations omitted)), *cert. denied*, 531 U.S. 1012 (2000).

Moreover, the Second Circuit has repeatedly stated that plaintiffs must do more than simply assert that a statement is false—"they must demonstrate with specificity why and how that is so." *Rombach*, 355 F.3d at 174. "The test for whether a statement is materially misleading under Section 10(b) . . . is whether the defendants' representations, *taken together and in context*, would have misled a reasonable investor." *Id.* at 172 n. 7 (internal citation and quotation marks

omitted) (emphasis added). Where a plaintiff asserts the falsity of a statement of belief or opinion, the plaintiff must plead that it "was both objectively false and disbelieved by the defendant at the time it was expressed." *Fait v. Regions Fin. Corp.*, 655 F.3d 105, 110 (2d Cir. 2011); *see City of Omaha, Neb. Civilian Emps.' Ret. Sys. v. CBS Corp.*, 679 F.3d 64, 67-68 (2d Cir. 2012) (stating that *Fait*'s "reasoning applies under Sections 10(b) and 20(a) of the 1934 Act"). "Statements regarding projections of future performance may be actionable under Section 10(b) or Rule 10b-5 if they are worded as guarantees or are supported by specific statements of fact," or if the speaker does not genuinely or reasonably believe them. *In re Int'l Bus. Machines Corp. Sec. Litig.*, 163 F.3d 102, 107 (2d Cir. 1998) (internal citations omitted).

Additionally, to be actionable under Section 10(b) and Rule 10b-5, the alleged misstatement or omission must be material. *Basic Inc. v. Levinson*, 485 U.S. 224, 238 (1988). That is, there must be a substantial likelihood that a reasonable person would consider the fact misstated or omitted important in connection with a contemplated securities transaction. *See id*. at 240; *Azrielli v. Cohen Law Offices*, 21 F.3d 512, 518 (2d Cir. 1994).

The Court will now turn to Plaintiffs' specific alleged misstatements and omissions, which can be categorized into two groups: (1) the January and Spring Investor Presentations; and (2) the Registration Statements and Prospectus accompanying Sundial's IPO.

### 1. The January and Spring Investor Presentations

Plaintiffs challenge the following statements made in the January and Spring Investor Presentations:

1. The January Investor Presentation stated that the "[h]emp license [in place] allows for cultivation, processing, and export of finished product from the UK." January Investor Presentation at 27; FAC ¶ 32.

2.  The January Investor Presentation touted that Bridge Farm's "[o]peration enables us to produce and distribute at scale almost immediately and more quickly than competitors." January Investor Presentation at 27; FAC ¶ 33.

3.  The January Investor Presentation laid out Bridge Farm's expected EBITDA of C$115 million and total revenue of C$255 million in 2020. January Investor Presentation at 35; FAC ¶ 36.

4.  The Spring Investor Presentation stated that Bridge Farm possessed a "hemp cultivation license." Spring Investor Presentation at 9; FAC ¶ 43.

5.  The Spring Investor Presentation emphasized that Bridge Farm "will enable us to be the first-mover in mass-scale, global hemp-derived CBD products." Spring Investor Presentation at 29; FAC ¶ 44.[2]

6.  The Spring Investor Presentation provided an expected EBITDA of C$79.5 million and total revenue of C$239.3 million. Spring Investor Presentation at 39; FAC ¶ 47.

None of these statements are sufficiently alleged to be false or materially misleading at the time made. As for the first, second, and fourth challenged statements, Plaintiffs have not adequately pleaded that Defendants did not possess a hemp cultivation license at the time the statement was made or that Defendants did not believe that the license in place allowed for cultivation, processing and exportation of finished product from the UK or that it would allow them to produce and distribute at scale almost immediately and more quickly than competitors. *See In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 571 (S.D.N.Y. 2014) ("A statement believed to be true when made, but later shown to be false, is insufficient. In such a circumstance, there is a lack of actionable falsity." (internal citation omitted)), *aff'd*, 604 F. App'x 62 (2d Cir. 2015).

Plaintiffs other challenged statements are similarly not actionable. The third, fifth and sixth statements are plainly forward-looking statements protected by PSLRA's safe harbor. The

---

[2] Sundial's placement agents, BMO and Cowen, made similar statements which are also not actionable for the same reasons discussed above. FAC ¶ 54 ("Cowen . . . emailed certain Plaintiffs and noted that 'Bridge Farm is a fully functional, licensed facility that will allow the [C]ompany to be a first mover in the mass scale, global hemp-derived CBD product market.'"); *see also id.* ¶ 57 (similar statement made by BMO).

PSLRA defines forward-looking statements to include, *inter alia*, "a projection of revenues, income [or] earnings," "plans and objectives of management for future operations," or "a statement of future economic performance." 15 U.S.C. § 78u-5(i)(1). Forward-looking statements are not actionable if they are "identified and accompanied by meaningful cautionary language *or* [are] immaterial *or* the plaintiff fails to prove that [they were] made with actual knowledge that it was false or misleading." *Slayton v. Am. Exp. Co.*, 604 F. 3d 758, 766 (2d Cir. 2010) (emphasis in original) (internal citation omitted).

Meaningful cautionary language "must convey substantive information about factors that realistically could cause results to differ materially from those projected in the forward-looking statement." *Id.* at 771 (quoting H.R. Conf. Rep. 104-369, at 43 (1995)). "Vague" or "boilerplate" language does not suffice. *Id.* at 772. "To determine whether cautionary language is meaningful, courts must first identify the allegedly undisclosed risk and then read the allegedly fraudulent materials—including the cautionary language—to determine if a reasonable investor could have been misled into thinking that the risk that materialized and resulted in his loss did not actually exist." *In re Delcath Sys., Inc. Sec. Litig.*, 36 F. Supp. 3d 320, 333 (S.D.N.Y. 2014) (quoting *Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 359 (2d Cir. 2002)) (internal quotation marks omitted). "Plaintiffs may establish that cautionary language is not meaningful by showing, for example, that the cautionary language did not expressly warn of or did not directly relate to the risk that brought about plaintiffs' loss." *Lopez v. Ctpartners Exec. Search Inc.*, 173 F. Supp. 3d 12, 25 (S.D.N.Y. 2016) (internal citation and quotation marks omitted).

The statements at issue were plainly forward-looking as they involved a "projection of income, revenue, [or] earnings" and the "plans and objectives of management for future operations." These statements were accompanied by meaningful cautionary language:

> Actual results could differ materially from those currently anticipated due to a number of factors and risks. Such factors may include that . . . any required additional . . . Foreign Licenses may not be obtained, [and] the Bridge Farm acquisition may not be completed . . . .

Spring Investor Presentation at 1.[3] This language directly related to the risk that brought about the Plaintiffs' loss. Thus, the Court concludes that these statements are not actionable.

### 2. The Registration Statements and Prospectus Accompanying Sundial's IPO

Plaintiffs allege that neither its Registration Statements nor the Prospectus accompanying Sundial's IPO, "correct[ed] or retract[ed] any of the material representations or omissions that Defendants had previously made," FAC ¶¶ 74, 79-81, and thus, "the same representations that the Company had made in the Offering Documents concerning Bridge Farm's assets and the benefits of the Acquisition remained unaltered," *id.* ¶ 75.

First, an "omission is actionable under the securities laws only when the corporation is subject to a duty to disclose the omitted facts." *In re Optionable Sec. Litig.*, 577 F. Supp. 2d 681, 692 (S.D.N.Y. 2008) (citation omitted). "Such a duty may arise when there is . . . a corporate statement that would otherwise be 'inaccurate, incomplete, or misleading.'" *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 101 (2d Cir. 2015) (citations omitted). And a statement is "materially misleading" where "defendants' representations, *taken together and in context*, would have misled a reasonable investor." *Rombach*, 355 F.3d at 172 n. 7 (internal citation and quotation marks omitted) (emphasis added).

Plaintiff suggests that Defendants had a duty to disclose that it "required additional licenses to produce or cultivate hemp or CBD in the commercial manner that it had previously

---

[3] While the third challenged statement providing Bridge Farm's expected EBITDA and total revenue was not accompanied by this disclaimer, the sixth challenged statement provided updated figures for these same metrics and did contain this disclaimer. Thus, considering Defendants' representations together and in context, the third challenged statement would not have misled a reasonable investor. *See Rombach*, 355 F.3d at 172 n.7.

represented to investors . . . and to achieve the 'first-mover' status Defendants had repeatedly referenced in the January and Spring Investor Presentations." FAC ¶ 76; *see also id.* ¶ 79. However, as discussed, Defendants' prior statements were not materially misleading. This is even more so considering Defendants' disclosures regarding the Bridge Farm acquisition in the Prospectus, including that: "[t]o date, [they] ha[d] not developed or sold any CBD products" and that they "intend[ed] to leverage certain of Bridge Farm's large-scale, low-cost production facilities to become a leader in the global CBD market, *as further regulations permit*." Kahn Decl. Ex. 2 ("Prospectus") at 4 (emphasis added).

### B. Plaintiff Has Not Adequately Alleged Scienter

To satisfy the PSLRA's pleading requirements for scienter, Plaintiffs may allege facts "(1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness*." ATSI Commc'ns*, 493 F.3d at 99 (internal citation omitted). In evaluating whether either of these showings has been made, the court may consider, among other things, whether the plaintiff has alleged that the defendant "(1) benefitted in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate; or (4) failed to check information they had a duty to monitor." *Novak*, 216 F.3d at 311 (internal citations omitted). When examining these factors, a court must be mindful that the inquiry is "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs*, 551 U.S. at 322-23. To determine that an inference of scienter is strong, the court must decide whether "a reasonable person would deem

the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 324.

Plaintiffs conclusorily assert that Defendants "knew (or should have known)" that Bridge Farm did not possess the necessary licenses. FAC ¶¶ 49, 51, 52, 69, 104, 109; *but cf.* ¶¶ 119, 124, 125 (asserting that Defendants "knew" that Bridge Farm did not possess the necessary licenses and thus any forward-looking statements were exempt from the PSLRA's safe harbor provision). They further assert that even though Defendants "knew that Bridge Farm did not possess the necessary licenses," upon information and belief, "Defendants nevertheless proceeded with the Bridge Farm acquisition . . . because Defendants were solely focused on maximizing their personal holdings and (i) were eager to complete the IPO sooner rather than later to avoid additional dilution, and (ii) believed that the Bridge Farm Acquisition made the success of the Company's IPO more likely." FAC ¶ 52. Plaintiffs appear to suggest that Defendants had the motive to commit the fraud because the sooner the IPO was completed the less diluted Defendants' shares would be. However, Plaintiff has not alleged that Defendants benefitted in a concrete and personal way from the purported fraud, as Defendants are not alleged to have sold the shares, nor that Defendants engaged in deliberately illegal behavior, knew facts or had access to information suggesting that their public statements were not accurate, or failed to check information they had a duty to monitor.

To the extent that the challenged statements are forward-looking, they are protected by PSLRA's safe harbor provision. "The safe harbor provision . . . requires dismissal if the plaintiffs do not 'prove that the forward-looking statement . . . was . . . made . . . with *actual knowledge* . . . that the statement was false or misleading." *Slayton*, 604 F.3d at 773 (quoting 15 U.S.C. §-78u-5(c)(1)(B)). To meet this requirement, "the plaintiffs must 'state with particularity both the

facts constituting the alleged violation, and the facts evidencing scienter, i.e., the defendant's intention to deceive, manipulate or defraud.'" *Id.* (quoting *Tellabs, Inc.*, 551 U.S. at 313). Plaintiffs have plainly failed to do this.

\*\*\*

Because the Court concludes that Plaintiff has failed to allege the challenged statements were materially false or misleading and that there is a strong inference of scienter, the Court need not consider the remainder of the parties' arguments regarding reliance and loss causation. Thus, the Court grants Defendants' motion to dismiss Plaintiffs' § 10(b) and Rule 10b-5 claims.

## II.     Plaintiffs' Securities Act Claims Fail as a Matter of Law

### A.  Section 12(a)(2) Claims

"Liability under Section 12(a)(2) arises when a person offers or sells a security by means of a prospectus or oral communication that includes a material misrepresentation or omission." *In re Royal Bank of Scotland Grp. plc Sec. Litig.*, No. 09-cv-300, 2012 WL 3826261, at \*6 (S.D.N.Y. Sept. 4, 2012) (citing 15 U.S.C. § 77l(a)(2)), *aff'd sub nom. Freeman Grp. v. Royal Bank of Scotland Grp. PLC*, 540 F. App'x 33 (2d Cir. 2013). Thus, in order to state a claim under § 12(a)(2) in connection with an IPO, a plaintiff must allege a material misrepresentation in the IPO prospectus. *In re Lone Pine Resources, Inc.*, No. 12-cv-4839, 2014 WL 1259653, at \*6 (S.D.N.Y. Mar. 27, 2014) ("Section 12(a)(2) claims are properly dismissed for the failure to identify a false or misleading statement or omission, [or] on the ground that the alleged misstatement is not material."). As previously discussed, the FAC does not identify any material misrepresentation in the Prospectus. Thus, the Court grants Defendants' motion to dismiss Plaintiffs' § 12(a)(2) claims.

**B. Section 15 Claims**

"To establish liability under Section 15, a plaintiff must show a primary violation of the Securities Act by the controlled person and control of the primary violator." *Youngers v. Virtus Inv. Partners Inc.*, 195 F. Supp. 3d 499, 523 (S.D.N.Y. 2016) (internal citations omitted). As Plaintiffs have not established a primary violation of the Securities Act, their Section 15 claims fail.

**III.    The Court Declines to Exercise Supplemental Jurisdiction Over the Remaining State Law Claims**

Under 28 U.S.C. § 1367(c)(3), the Court may exercise supplemental jurisdiction over Plaintiffs' remaining state law claims after dismissing "all claims over which it has original jurisdiction." However, the Second Circuit encourages courts to avoid exercising supplemental jurisdiction. "[I]f the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well." *First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 183 (2d Cir. 2004) (quoting *Castellano v. Bd. of Trustees*, 937 F.2d 752, 758 (2d Cir. 1991)).

Having dismissed all of Plaintiffs' securities claims, and there being no other basis for federal jurisdiction over this case, the Court elects to not exercise its supplemental jurisdiction over Plaintiff's state law claims. See 28 U.S.C. § 1367(c)(3); *Boustany v. Xylem Inc.*, 235 F. Supp. 3d 486, 496-97 (S.D.N.Y. 2017). Accordingly, those claims are dismissed without prejudice.

## CONCLUSION

For the reasons herein, Defendants' motion to dismiss Plaintiffs' complaint is

**GRANTED** with prejudice. The Clerk of Court is directed to terminate ECF No. 24 and close

this case.

**SO ORDERED.**

Dated: September 30, 2021
      New York, New York

                                            **ANDREW L. CARTER, JR.**
                                            **United States District Judge**